IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARIANNE SAWICKI                :
                                :
v.                              :   Civil No. WMN-03-1600
                                :
MORGAN STATE UNIVERSITY <u>et al.</u>  :

**<u>MEMORANDUM</u>**

Before the Court is the motion for summary judgment filed by Defendants Morgan State University, the State of Maryland, Earl Richardson, Clara Adams, Burney Hollis, and Otto Begus. Paper No. 107.  Also pending is Defendants' motion to seal the records in this case.  Paper No. 115.  The motions are fully briefed and ripe for decision.  Upon a review of the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Defendants' motion for summary judgment will be granted.  The motion to seal will be denied.

**I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

Plaintiff Marianne Sawicki was hired under a three-year contract by Defendant Morgan State University (MSU) as an Associate Professor in its Department of Philosophy and Religious Studies in March 2000.  Defendant MSU denied her tenure application in June 2002 and her contract expired in June 2003.

In her Second Amended Complaint, Paper No. 35, Plaintiff alleges the following: (1) that Defendants discriminated against her on the basis of her race and gender; (2) that the discrimination caused her tenure denial, and (3) that the discriminatory conduct constituted sexual harassment. Essentially, Plaintiff argues that Defendant MSU's President, Vice-President of Academic Affairs (VPAA), Dean of the College of Liberal Arts (Dean), and Chair of the Philosophy and Religious Studies Department (Chair) (as well as other colleagues and some MSU students) each worked to undermine her performance and advancement at MSU because she is a white female, at the same time that they provided favorable treatment to MSU's black male instructors (and students). Following the close of discovery, Defendants have moved for summary judgment on each of Plaintiff's remaining claims, all of which are brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1983.

Review of the undisputed facts, construed with all reasonable inferences drawn in Plaintiff's favor, shows that Plaintiff began teaching for Defendant MSU in the Fall of 2000 as an associate professor.  She arrived at the university as an experienced teacher and accomplished scholar.  During her first year at MSU, however, Plaintiff encountered substantial

problems with many of her students.  The problems arose from
Plaintiff's enforcement of classroom codes of conduct, often
related to restricting the presence of food and drink in the
classroom and enforcing prompt attendance policies.

Relations with some of her students deteriorated to the
point where a "major confrontation" lasting 25 minutes
occurred in class on February 28, 2001.  Defs.' Ex. 9,
Plaintiff's contemporaneous typed notes.  One student, who had
been ordered to remove her cup of soda, concluded her ensuing
argument with Plaintiff by exclaiming "You're crazy. Bitch!"
as she left the classroom.  Id.  "[S]everal students
applauded" the insult prompting Plaintiff to admonish the
entire class for "totally unacceptable" behavior and to order
the entire class "to be silent for three minutes."  Id.
Several students refused to sit silently and immediately
complained that Plaintiff's treatment of her adult students
throughout the semester was provocatively disrespectful.  See
id.  Plaintiff noted immediately after the incident that "a
number of the students have inappropriate needs which I cannot
possibly fill.  They are not ready to allow me to do my job."
Id.  She added that an honest examination of her own
conscience did "not find any disrespect for them."  Id.

Plaintiff then instituted formal disciplinary proceedings

3

against five of her students with the University's Office of
Student Judicial Affairs.[1]   Defs.' Ex. 5.   Plaintiff was also
the subject of a petition drive by 14 of her students from
that same class formally requesting an investigation of
Plaintiff by the Chair for perpetuating "an inhospitable
academic environment."   Defs.' Ex. 10.   One 40 year-old
student, Vincent Downs, Jr., wrote to Dean Hollis detailing
what he considered to be Plaintiff's pattern of "provoking
students in order to make it appear as if the student is a
problem" and stating his firm belief that her behavior "stems

_____

[1]   Each of the five assiduously detailed charge letters
began "[i]t has become necessary for me to refer a student to
the Student Judicial Program Office for disciplinary action"
and concluded "I reluctantly request that you review [the
alleged behavior] and impose appropriate sanctions."   Defs.'
Ex. 5.   Plaintiff specifically notes, <u>inter alia</u>, the
following classroom misconduct: one student ridiculed her for
being "crazy," "insane," and "deluded" and was "aggressively
chewing gum and popping it in [her] face" while she
reprimanded him privately during class; a second student
"called me a 'crazy woman' and 'bitch;'" a third student
characterized Plaintiff's personality as "anal" and then
"maybe not anal, but compulsive" adding that his parents
believed that Plaintiff "must be insane" and that he dreads
coming to class because he considers it "unbearably
unpleasant;" a fourth student, allegedly still simmering over
being locked out of the classroom while using the bathroom
three weeks earlier, essentially stated "that [Plaintiff]
exhibit[s] mental illness, 'mood swings,' and Pre Menstrual
Syndrome"; and a fifth student, who had told the class three
weeks earlier that "she had decided to cease speaking with
[Plaintiff]," stated that Plaintiff has "mood swings and a
split personality" and "exhibit[s] Pre Menstrual Syndrome."
<u>Id.</u>   The offending students were male and female, white and
black.

from her inability to receive any information that is contrary
to her opinions and beliefs." Defs.' Ex. 11.  He concluded
that he could "no longer allow [him]self to be subjected to
this *unfair, degrading*, and *harassing* treatment of this
faculty member" and would likely be pressing charges against
her.  Id. (emphasis in original).  Ultimately, despite the
student petition and complaints, the Dean supported Plaintiff
on the grounds that she was free to enforce her stated class
rules as she saw fit, as long as she did not violate students'
rights.  Defs.' Ex. 74 at 130.

The record also shows no factual dispute that Plaintiff
also had strained relations with some important colleagues in
her small department.  Specifically, within her first three
semesters at MSU she had several arguments with her Chair,
Otto Begus, a white male who in 2000 had enthusiastically
requested that Plaintiff be hired as a full professor.  Defs.'
Ex. 67.  Her department colleague Joanna Crosby, a white
female tenured in 2003, stated that Plaintiff "was the most
difficult colleague I have ever had," noting that Plaintiff
was unreceptive to her advice on effective class management,
generally unpleasant and difficult in department meetings, and
had even accused her of being "unethical" in her choice of a
logic textbook.  Id.  After receiving complaints about

5

Plaintiff's teaching from several of her own former students, Crosby stated that she observed three of Plaintiff's classes and subsequently reported Plaintiff's "pedantic teaching style" and "condescending tone towards students" to their Chair.  Id.  Her department colleague Janice McLane, a white female tenured in 1999 and who briefly served as Plaintiff's acting Chair, stated that Plaintiff was "the most troublesome faculty member I have ever had to deal with in 20 years of employment in higher education."  Defs.' Ex. 69.  In addition to recounting several conflicts she had with Plaintiff, McLane noted that Plaintiff generated an inordinate number of student complaints many of which were "highly critical."[2]  Id.

Plaintiff's evaluations at every stage of the tenure review process reflected concerns about her teaching and her fractured relationships with many of her students as well as her problems relating to her colleagues.  In October 2001, the department's tenure review committee (DRC) unanimously recommended that Plaintiff be denied tenure and promotion; Plaintiff's Chair made the same recommendation.  In November

---

[2]  The Court recognizes that Plaintiff may dispute the substance of Crosby and McLane's statements.  The Court includes them in its statement of undisputed facts, however, merely to illustrate the fact that Plaintiff did not get along well with some of her department colleagues or Chair, even when those colleagues shared some or all of her protected traits.

2001, the school-wide review committee (SRC) made the same
unanimous recommendation.  In January 2002, however, the Dean
did not adopt the consistent recommendations of the Chair and
two unanimous committees.  Defs.' Ex. 18.  Instead, he
recommended deferral, noting that the record on her teaching
was mixed with some students rating her very highly while
others were so negative as to file complaints and petitions
against her.[3]  Id.  His recommendation highlighted that there
was great uncertainty regarding her teaching and that tenure
and promotion "require much more certainty than is present
here."  Id.  In rating her service component favorably, the
Dean addressed her activities in the wider community without
mentioning her collegiality problems.  Id.  The Vice-President
for Academic Affairs (VPAA) conducted her review of the
dossier and, on June 28, 2002, recommended a one-year deferral
on the decision.  Defs.' Ex. 20.  In her letter to Plaintiff,
the VPAA asked her to address the area of "substantial
professional achievement" as defined in MSU's tenure policies
and asked her to meet with the Dean to discuss ways to
strengthen her application.  Id.

---

   [3] The Dean's letter specifically included seven
unequivocally positive quotes about Plaintiff's teaching drawn
from student evaluations, but only addressed the complaints
between Plaintiff and her students in general terms.

That same day, the President notified Plaintiff by letter
of his decision to offer deferral and expressly wrote that if
Plaintiff "agree[d] with the terms of this deferral," she
needed to return her signed agreement "within 10 calendar days
from the date of this letter."  Defs.' Ex. 21.  The letter
stated that failure to meet the terms of the deferral would
result in termination without further notice on June 30, 2003.
Id.  Plaintiff did not sign and return the deferral within
that time period.

Instead, Plaintiff appealed the decision to defer her
tenure application.  Plaintiff asserts that she believed her
appeal of the adverse tenure decision also constituted
acceptance of the offer to re-apply for tenure in the coming
year, and for summary judgment purposes the Court will assume
that was her sincere belief.  Regardless of Plaintiff's
beliefs as to what she was doing, however, the facts in the
record and law of the case show that she did not accept the
deferral offer, and by mid-July 2002 her appeal was limited to
the adverse tenure decision.  Unless her appeal succeeded,
Plaintiff would be terminated on June 30, 2003.  See March 15,
2004, Mem. at 21 (rejecting retaliation claim rooted in Fall
2002 complaints and stating "decision to terminate [Plaintiff]
was effectively made" in July 2002 when Plaintiff failed to

accept the deferral offer within ten days).

Plaintiff's appeal was unsuccessful.  Her appeal was heard by the VPAA on October 8, 2002, and denied by the VPAA in an October 15, 2002, letter advising Plaintiff of her right to appeal to the President.  Claiming procedural error, Plaintiff appealed to the President by letter dated October 23, 2002, stating her incorrect assumption that she had been granted a one-year deferral and fourth year on her contract and proposing "immediate tenure and promotion" as "the only possible remedy for the University's muddling" of the process. Defs.' Ex. 24.  The President convened a Faculty Appeals Committee to hear the appeal, and it determined that there was no procedural error or violation of the tenure process policies.  The President then notified Plaintiff on December 10, 2002, that her appeal was denied and that her employment would terminate on June 30, 2003.

Other facts regarding the composition of Plaintiff's department and the relevant actors are not disputed.  First, in 2001, the seven-person department consisted of five white and two African members, and its male to female gender ratio was 4:3.  Only Plaintiff's Chair and Janice McLane, both white, were already tenured in 2001 (McLane in 1999).  The only other white woman in the department was tenured in 2003.

9

Plaintiff's Chair is white, the VPAA is female, and Plaintiff's position was subsequently filled by a white male. The President, VPAA, Dean, and Chair who all agreed that Plaintiff should not have been tenured in 2002 are the same individuals who all agreed that she should have been hired in 2000.

Plaintiff claims her career advancement was done in by the "racial politics" played by Defendants as well as their anti-female bias.  She claims evidence of unlawful discrimination from the student body up the chain of command through the President's office.  Specifically she alleges that her Chair set her up for failure by giving her an onerous teaching schedule with difficult students, ordering her to practice strict classroom management and then criticizing her when that failed,[4] commandeering the tenure review process to ensure her defeat, favoring her black male colleague, and

---

[4]  The Court does not see how any reasonable juror could accept this theory.  Plaintiff had extensive experience as a college and high school lecturer and had necessarily spent countless hours independently managing her classrooms before even stepping foot on MSU's campus.  After encountering problems, Plaintiff sought her Chair's advice on how to run her classroom.  Pl.'s Opp. at 7.  For her to now allege (1) that she was forced by her Chair to run her class in an adversarial manner designed to cause student insurrection that would reflect poorly on her and (2) that she was compelled, against her better judgment, by an administrator in the Office of Student Affairs to file formal disciplinary charges against five of her students does not withstand reasoned analysis.

"bullying and intimidating" her.  She alleges that the DRC was composed of members either hostile to her as a white woman or unwilling to cross her Chair (who also chaired Plaintiff's DRC) and his allies.  She alleges that the Dean only sought negative information about her when investigating the Spring 2001 class insurrection,[5] failed to filter the Chair's lies about Plaintiff when reviewing her tenure application and passed false statements on to the VPAA.  She alleges that the VPAA failed to conduct an independent review that would have detected inconsistencies indicating unlawful discrimination and delayed notifying her of her adverse tenure decision. Finally, she alleges that the President failed to administer the university's EEO program, failed to hire her as a full professor, failed to conduct an independent review that would have detected inconsistencies indicating unlawful discrimination, and falsely told her that she lacked appeal rights.  Plaintiff maintains that taken together these circumstances create a reasonable inference that Defendants unlawfully discriminated against her.

## II.  LEGAL STANDARD

Summary judgment is proper if the evidence before the

---

[5]  This allegation is tenuous at best considering that the Dean sided with Plaintiff against the disgruntled students.

11

court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment
as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits, or other documentation which demonstrates that a triable issue of fact exists for trial. Celotex, 477 U.S. at 324. Unsupported speculation is insufficient to defeat a motion for summary judgment. Felty, 818 F.2d at 1128 (citing Ash v. United

<u>Parcel Serv., Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986)).

Furthermore, the mere existence of some factual dispute is

insufficient to defeat a motion for summary judgment; there

must be a genuine issue of material fact.  <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  Thus, only disputes

over those facts that might affect the outcome of the case

under the governing law are considered to be "material."  <u>Id.</u>

In the context of employment discrimination pretext

cases, "a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted

justification is false, may permit the trier of fact to

conclude that the employer unlawfully discriminated" but will

not necessarily do so.  <u>Reeves v. Sanderson Plumbing Products,</u>

<u>Inc.</u>, 530 U.S. 133, 148 (2000).  The Supreme Court adds,

"[c]ertainly there will be instances where, although the

plaintiff has established a prima facie case and set forth

sufficient evidence to reject the defendant's explanation, no

rational factfinder could conclude that the action was

discriminatory."  Construing <u>Reeves</u>, the Fourth Circuit

directs that "[e]ven when a plaintiff demonstrates a prima

facie case and pretext, his claim should not be submitted to a

jury if there is evidence that precludes a finding of

discrimination . . . ."  <u>Rowe v. Marley Co.</u>, 233 F.3d 825, 830

(4th Cir. 2000).

**III.  DISCUSSION**

　　A.  Employment discrimination law after Desert Palace

　　Congress, through Title VII, has made it unlawful for an employer to "discharge any individual" or "to limit . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a) (West Supp. 2004).  By amendment in 1991, Congress clarified that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  Id. § 2000e-2(m).  Congress also provides a limited affirmative defense for an employer who violates § 2000e-2(m) where it "demonstrates that it would have taken the same action in the absence of the impermissible motivating factor."  Id. § 2000e-5(2)(B).

　　The Supreme Court, interpreting Title VII, has constructed two analytical frameworks, pretext and mixed motive, by which the federal courts may evaluate

14

discrimination cases.  Compare McDonnell Douglas v. Green, 411

U.S. 792 (1973) (introducing pretext framework[6]) with Price

Waterhouse v. Hopkins, 490 U.S. 228 (1989) (introducing mixed

motive framework).  The Fourth Circuit stresses that

"[r]egardless of the type of evidence offered by a plaintiff

as support for her discrimination claim (direct,

circumstantial, or evidence of pretext), or whether she

proceeds under a mixed-motive or single-motive theory, '[t]he

ultimate question in every employment discrimination case

involving a claim of disparate treatment is whether the

plaintiff was the victim of intentional discrimination.'"

Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277,

286 (4th Cir. 2004) (en banc) cert. dismissed, 125 S. Ct. 1115

(2005) (quoting Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 153 (2000)).

     The Supreme Court's unanimous 2003 decision in Desert

Palace, Inc. v. Costa, however, radically altered the contours

of the mixed motive framework and has created some confusion

regarding the continued viability of the McDonnell Douglas

pretext framework.  539 U.S. 90 (2003).  Before Desert Palace,

---

     [6]  The pretext framework is also commonly referred to as
the McDonnell Douglas or single motive framework.  As used in
this opinion, the three terms (or any hybrid of them, e.g.,
McDonnell Douglas pretext framework) are functionally
synonymous.

courts considered direct evidence of unlawful discrimination a
prerequisite to proper use of the mixed motive framework.  See
Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989)
(O'Connor, J., concurring) and progeny, e.g., Fuller v.
Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995) (requiring direct
evidence pursuant to Justice O'Connor's Price Waterhouse
concurrence).  In the absence of direct evidence, plaintiffs
with only circumstantial evidence were relegated to proceeding
under McDonnell Douglas's pretext framework.[7]  Desert Palace,
however, makes clear that no such heightened evidentiary
requirement exists under the 1991 amendments to Title VII.

---

[7]  In its simplest form the three-step pretext framework
requires the plaintiff to make out a prima facie case of
discrimination after which the burden shifts to the defendant
to put forth a non-discriminatory reason for the adverse
action.  McDonnell Douglas v. Green, 411 U.S. 792 (1973).
From there, to prevail the plaintiff must show that the
defendant's reason was merely a pretext and that
discrimination was the real reason for the adverse action.
Id.  The Supreme Court further refined the proper application
of the pretext framework, most notably in Texas Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248 (1981) (holding that Title
VII defendant bears only the burden of explaining clearly the
nondiscriminatory reasons for its action when the plaintiff
has proved a prima facie case of employment discrimination);
St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993) (holding
trier of fact's rejection of employer's asserted legitimate,
nondiscriminatory reasons for its challenged actions does not
entitle employee to judgment as a matter of law under
McDonnell Douglas); and Reeves v. Sanderson Plumbing Products,
Inc., 530 U.S. 133 (2000) (holding prima facie case and
evidence of pretext may permit trier of fact to find unlawful
discrimination, without additional, independent evidence of
discrimination).

539 U.S. 90, 101-02 (2003) (construing 42 U.S.C. § 2000e-2(m) and abrogating <u>Fuller</u>); <u>see also</u> <u>Hill v. Lockheed Martin</u> (explaining changes to proper application of mixed motive framework from <u>Price Waterhouse</u> through <u>Desert Palace</u> and stating, at 284-85, that mixed motive plaintiff need only present sufficient evidence that illegal discrimination motivated adverse employment action).

With no substantive distinction between the evidentiary burdens required for application of the mixed motive or pretext frameworks, federal district courts have come to different conclusions regarding whether these two frameworks remain separately viable in the wake of <u>Desert Palace</u>.  Soon after <u>Desert Palace</u> was issued, one district court flatly stated that the decision exposes the dichotomy between mixed and single motive cases as simply "a false one."  <u>Dare v. Wal-Mart</u>, 267 F. Supp. 2d 987, 991-92 (D. Minn. 2003) (condemning the "legal fiction" of a <u>McDonnell Douglas</u> single motive case as a "machination[] of jurisprudence that do[es] not comport with common sense and basic understandings of human interaction" because "few employment decisions are made solely on the basis of one rationale to the exclusion of all

others").[8]  Many other courts, moved by Dare's analysis but

unwilling to jettison McDonnell Douglas altogether, adopted a

merged or modified McDonnell Douglas framework test, best

articulated by Dunbar v. Pepsi-Cola General Bottlers of Iowa,

Inc. 285 F. Supp. 2d 1180, 1194 (N.D. Iowa 2003),[9] abrogated

by Griffith v. City of Des Moines, 387 F.3d 733 (8th Cir. 2004)

(stating, at 736, "we conclude that Desert Palace had no

impact on prior Eighth Circuit summary judgment decisions")

(emphasis in original).  Along with the Eighth Circuit in

_____

8  See also T.L. Nagy, The Fall of the False Dichotomy:
The Effect of Desert Palace v. Costa on Summary Judgment in
Title VII Discrimination Cases, 46 S. Tex. L. Rev. 137, 151-52
(2005) (noting that 12 of the first 13 district court judges
issuing opinions on the issue "conclude that [Desert Palace]
significantly modifies the traditional [McDonnell Douglas]
paradigm").

9  The Dunbar court concluded that to fully accommodate
Desert Palace, only the third step of the McDonnell Douglas
framework required modification and that once a prima facie
case is made and the defendant has proffered a legitimate
reason "to prevail . . . the plaintiff must prove by the
preponderance of the evidence either (1) that the defendant's
reason is not true, but is instead a pretext for
discrimination (pretext alternative), see Reeves,[citation
omitted]; or (2) that the defendant's reason, while true, is
only one of the reasons for its conduct, and another
'motivating factor' is the plaintiff's protected
characteristic (mixed-motive alternative)."  Id. at 1197-1198
(emphasis in original).  The first two district court
decisions directly on point and within this circuit, both
issued by Judge Beaty in the Middle District of North
Carolina, adhered to the reasoning in Dunbar.  Rishel v.
Nationwide Mutual Ins. Co., 297 F. Supp. 2d 854, 862-866
(M.D.N.C. 2003); Jones v. Southcorr, LLC, 324 F. Supp. 2d 765,
775-77 (M.D.N.C. 2004).

<u>Griffith</u>, other federal appeals courts soon issued rulings that the <u>McDonnell Douglas</u> framework remained viable.  <u>See, e.g.</u>, <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 725 n.17 (11th Cir. 2004) (stating "the <u>Desert Palace</u> holding was expressly limited to the context of mixed-motive discrimination cases"). The <u>Desert Palace</u> decision itself is simply cryptic regarding its impact on single motive cases, merely stating by footnote that "[t]his case does not require us to decide when, if ever, [42 U.S.C. § 2000e-2(m)] applies outside of the mixed-motive context."  539 U.S. at 94 n.1.  In short, there remain many unanswered questions, and courts throughout the nation have been struggling to navigate the morass of competing rationales and instructions when seeking to properly adjudicate employment discrimination claims.

On July 25, 2005, the Fourth Circuit shed some much-needed light on the subject when it expressly recognized the continued vitality of the <u>McDonnell Douglas</u> framework in pretext cases, noting (1) that the <u>Desert Palace</u> decision did not even mention <u>McDonnell Douglas</u>, (2) that "the Supreme Court has continued to invoke the burden-shifting framework in pretext cases," and (3) that other circuits "have also rejected the view that <u>Desert Palace</u> nullified the <u>McDonnell</u>

_Douglas_ framework."[10]   _Diamond v. Colonial Life & Accident
Ins., Co._, --- F.3d ----, 2005 WL 1713188 *6 n.5 (4th Cir. July
25, 2005) (published opinion).  At the same time, however, the
court also noted that where a plaintiff "simply prefers to
proceed without the benefit of the burden-shifting framework,
she is under no obligation to make out a prima facie case."
_Id._ n.4.

Therefore, this Court will continue to use the tools
provided by the traditional _McDonnell Douglas_ framework in
assessing any employment discrimination claim that is not
solely a mixed motive case and must do so where the case is
solely based on pretext.[11]  It will not, however, automatically
grant a defendant's motion for summary judgment where a
plaintiff falls short in meeting one element of her _McDonnell
Douglas_ prima facie case, if that case can also be reasonably

---

[10]  One of the three sister circuit decisions cited
favorably by the Fourth Circuit in _Diamond_ rejects the
conclusion that _McDonnell Douglas_ has been nullified but
nonetheless adopts _Dunbar's_ modified _McDonnell Douglas_
framework for cases where plaintiff proceeds under both mixed
motive and pretext theories.  _Keelan v. Majesco Software,
Inc._, 407 F.3d 332, 341 (5th Cir. 2005) ("This Circuit has
adopted use of a 'modified _McDonnell Douglas_ approach' in
cases where the mixed-motive analysis may apply.").

[11]  The Court understands _Diamond_ to direct that _McDonnell
Douglas_ controls, unequivocally and without modification,
those cases that are fairly characterized as being only
pretext (and not mixed motive) cases.

construed as a mixed motive case.  While struggling to meet the low threshold of the prima facie case is typically indicative of a case's overall infirmity, when evaluating cases that can fairly be described as alleging both pretext and mixed motive (or mixed motive alone), this Court will focus on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision.

B.  Employment discrimination law after Hill v. Lockheed Martin and the "actual decisionmaker" test

Where a plaintiff seeks to attribute her supervisor's discriminatory conduct to her employer, the Fourth Circuit now applies a particularly rigorous standard.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277 (4th Cir. 2004) (en banc), cert. dismissed, 125 S. Ct. 1115 (2005).  In Hill, the plaintiff had put forth substantial direct and circumstantial evidence that her safety inspector, who reported her for violations that ultimately caused her dismissal, held discriminatory animus towards her based on her age and gender. The majority found that even with all reasonable inferences taken in Hill's favor, the facts demonstrated that she had committed the reported infractions warranting the termination ordered by the non-discriminating agents of her employer and

granted summary judgment to the defendant.[12]

The Fourth Circuit, however, did not grant the defendant's summary judgment motion merely on the grounds that the facts demonstrated that discriminatory animus was irrelevant or played no role in the employer's decision to terminate her.  Instead, it focused on the discriminating safety inspector's lack of control over final personnel decisions and introduced the following test: to survive summary judgment, a Title VII plaintiff "must come forward with sufficient evidence that the [allegedly discriminating] subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer."  Id. at 291.  In so holding, the court stressed that discriminating employees who are subordinate to the actual decisionmaker are not 'principally responsible' for the decision "simply because they have influence or even substantial influence in effecting a challenged decision."  Id. (emphasis added).

_____

[12]  In dissent, Judge Michael, joined by Judges Motz, King, and Gregory, wrote that there was a clear factual dispute as to whether plaintiff Hill had committed one of the infractions or simply been set up by her discriminating safety inspector.  Id. at 300 (Michael, J., dissenting).  The dissent also states that Hill's third reprimand, which quickly led to her discharge, was the product of a flurry of dubious discrepancy reports written by her safety inspector in the days after Hill complained about him.

This standard, which this Court is clearly obligated to follow, presents a substantial obstacle to the Title VII plaintiff who, as here, alleges that she was terminated because of the discriminatory conduct of her immediate supervisors but struggles to show that the ultimate decisionmaker harbored that same animus.  The rule has the unfortunate potential to create a safe harbor for workplace discrimination by any prejudiced supervisor who can fairly be described as not being the final decisionmaker on personnel decisions.[13]  Properly applying <u>Hill's</u> actual decisionmaker test to Defendant MSU's multi-tiered tenure application process shelters the alleged discriminatory acts of Plaintiff's immediate supervisors from this Court's analysis unless these discriminatory acts can be fairly attributed to the actual decisionmakers.

Defendant MSU's tenure application process has several stages of review.  It begins when the candidate submits her application and dossier to her department's Chair.  The DRC then reviews the application materials and furnishes its recommendation back to the Chair.  The Chair submits the

_____

[13]  <u>See</u>, <u>e.g.</u>, <u>Lust v. Sealy, Inc.</u>, 383 F.3d 580, 584 (7th Cir. 2004) (declining to adopt <u>Hill's</u> holding that "subordinate's influence, even substantial influence, over the supervisor's decision is not enough to impute the discriminatory motives of the subordinate to the supervisor").

dossier along with both his own and the DRC's recommendations
to the Dean.  The SRC then evaluates the application and
furnishes its recommendation back to the Dean.  From there,
the Dean submits the dossier along with his own and all other
accumulated recommendations to the VPAA.  She then makes her
own recommendation and forwards all the materials to the
President who ultimately issues the decision on tenure.

Applying <u>Hill</u> to these facts, it is clear that only the
President and VPAA can be considered the actual
decisionmakers.  Plaintiff's Chair recommended that Plaintiff
be denied tenure outright but his recommendation was not
followed; Plaintiff was offered a deferral.  The Dean's
recommendation that Plaintiff be deferred for one year was
honored by the VPAA and President but there is no factual
dispute that 8 of the Dean's 26 tenure recommendations (made
in the five-year period beginning in 1999-2000) have not been
followed.  Defs.' Ex. 65 ¶6.  Under <u>Hill</u>, neither the Chair[14]
nor Dean can reasonably be considered actual decisionmakers.
The Court presumes that the President is an actual
decisionmaker and also considers the VPAA to be one because

---

[14]   The record also reflects that the Chair had originally
recommended that Plaintiff be hired as a full professor but
that she was hired as an associate.  Whether speaking for or
against Plaintiff, the Chair in this case clearly lacks actual
decisionmaking authority over Plaintiff's employment.

the record shows that her recommendations on tenure and promotion were followed by the President in all but one instance in the five-year period starting in 1999-2000. Defs.' Ex. 65.

Plaintiff claims that Defendants discriminated against her because of her race and gender.  As explained in Section III-A, <u>supra</u>, where an employment discrimination claim can be fairly construed as alleging both pretext and mixed motive, as in this case,[15] the Court will analyze Plaintiff's claims under both frameworks.  If Plaintiff is unable to sustain her allegations under either framework, Defendants are entitled to summary judgment.

C.  <u>Race and gender discrimination in the denial of tenure</u>

1.  <u>Pretext</u>

To establish a pretext claim for unlawful discrimination in a failure to promote/tenure case, Plaintiff must first make

_____

[15] Plaintiff's opposition makes clear that she considers this action to be brought under both theories.  <u>See</u> Pl.'s Opp. at 31 (discussing standards for pretext and mixed motive frameworks).  More important, common sense dictates that most employment discrimination cases after <u>Desert Palace</u> will properly be treated as mixed motive cases.  <u>See</u>, <u>e.g.</u>, <u>Dare v. Wal-Mart</u>, 267 F. Supp. 2d 987, 991-92 (D. Minn. 2003) (stating the unassailable proposition that "few employment decisions are made solely on basis of one rationale to the exclusion of all others").

out a prima facie case of discrimination showing the following: (1) that she is a member of a protected group; (2) that she suffered some adverse employment action; (3) that at the time of the adverse employment action, she was performing at a level that met her employer's legitimate expectations; and (4) that the adverse employment action occurred under circumstances that raise an inference of unlawful discrimination.  Larebo v. Clemson Univ., 175 F.3d 1014, 1999 WL 152863, *3 (4th Cir. 1999) (unpublished decision) (applying pretext framework to denial of tenure) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).  From there, under the familiar McDonnell Douglas burden-shifting paradigm, Defendants must then merely produce a non-discriminatory reason for their action.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  At that point, "the McDonnell Douglas framework--with its presumptions and burdens--disappear[s] and the sole remaining issue [is] discrimination vel non."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-143 (2000) (internal citations and quotations omitted).

Because all plaintiffs necessarily have a race and gender and the tenure denial is undisputed here, Plaintiff quickly satisfies the first two elements of her prima facie case.  She

has also put sufficient evidence into the record from which a reasonable juror could conclude that she was meeting her employer's legitimate expectations as an associate professor. Because Defendants also quickly meet the second step burden of producing a non-discriminatory reason for the denial, the Court's inquiry necessarily focuses on the fourth element of the prima facie case, whether the circumstances surrounding her tenure denial raise a reasonable inference of unlawful discrimination, and if so, whether a reasonable juror could ultimately conclude that unlawful discrimination played a role in the tenure denial.

The Fourth Circuit has repeatedly stated its reluctance to second-guess the inherently subjective tenure decisions of academic institutions. Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995) ("The federal courts have adhered consistently to the principle that they operate with reticence and restraint regarding tenure-type decisions."); Larebo v. Clemson Univ., 175 F.3d 1014, 1999 WL 152863 *4 (4th Cir. Mar. 22, 1999) (unpublished decision) (affirming summary judgment in denial of tenure case) ("When considering whether a decision to deny tenure was based on an unlawful reason, the plaintiff's evidence of pretext 'must be of such strength and quality as to permit a reasonable finding that the denial of

27

tenure was obviously or manifestly unsupported.'"); <u>Fabunmi v. Univ. of Md. at College Park</u>, 172 F.3d 862, 1999 WL 89277 *1 (4th Cir. Feb. 23, 1999) (unpublished decision) (internal citation omitted) ("Absent credible evidence of unlawful discrimination, federal courts are obliged to refrain from questioning the wisdom of academic tenure decisions.").

Heeding both the Fourth Circuit's direction on judicial review of tenure decisions and the recent en banc holding in <u>Hill</u>, this Court concludes that no reasonable juror could find that the circumstances surrounding Plaintiff's tenure denial amount to unlawful discrimination or otherwise conclude that unlawful discrimination played a role in the tenure denial. While Plaintiff alleges innumerable indicia of discrimination, the Court will address only those necessary to resolve the case.

Under <u>Hill's</u> actual decisionmaker test, the alleged discriminatory behavior of the Chair and Dean is immaterial if it cannot be imputed to the actual decisionmakers, here the President and VPAA. While Plaintiff's complaint and opposition are brimming with allegations of discriminatory behavior by her immediate supervisors, there is little in the record to suggest that either decisionmaker should have been on notice of either supervisor's allegedly disparate treatment

of Plaintiff (or any underlying discriminatory animus towards whites or women) at the time they made the decision to defer her tenure application.  Plaintiff must provide a factual basis from which a reasonable juror could conclude that the President and VPAA were motivated by unlawful discrimination when they made their tenure decision.[16]

Plaintiff points to three black male colleagues' experiences at MSU as evidence of disparate treatment.  Most pertinent to the Court's analysis is the experience of Tsenay Serequeberhan, a black male who also joined the same department as Plaintiff in 2000 and applied for tenure in 2002 along with Plaintiff.  While Plaintiff vigorously asserts that Serequeberhan received an easier teaching load and other favorable treatment from the Chair despite Plaintiff's superior performance, which she alleges was recognized by her peer and student evaluations, it is undisputed that both Plaintiff and Serequeberhan were deferred by the actual

---

[16]   While the Court has expressed its concern over the potential that <u>Hill</u> may create a safe harbor for unlawful employment discrimination, it does not believe that <u>Hill's</u> holding amounts to a free pass for non-decisionmakers to discriminate against their subordinate employees or for actual decisionmakers to duck liability by shunning evidence of the unlawful actions of their lower level managers.  Where the decisionmakers reasonably should have recognized that unlawful discrimination was tainting a manager's report or recommendation, they certainly can be liable for failing to address the problem.

decisionmakers in 2002, rebutting Plaintiff's case of disparate treatment in the tenure decision.  Serequeberhan, unlike Plaintiff, accepted Defendant MSU's deferral offer and successfully re-applied for tenure the next year.

The Court cannot draw a reasonable inference of discrimination from Serequeberhan's ultimate success in gaining tenure because Defendant has clearly demonstrated through comprehensive personnel records that in the five-year period beginning in 1999-2000, applicants for tenure and/or promotion at MSU fared comparably across racial and gender lines.[17]  See Def.'s Ex. 65.  Within the much narrower realm of Plaintiff's own department, the only other white woman seeking tenure was granted tenure in 2003.  Id.  Likewise, the Court finds no support in the record for Plaintiff's conclusory assertion that she and Serequeberhan were in direct

_____

[17]  In the face of this comprehensive statistical data, which Plaintiff does not dispute, Plaintiff's allegations of favorable treatment of Frank Brown and Robert Birt do not raise an inference of unlawful discrimination.  Brown is a poor comparison because he was a member of a different department (English) and never achieved tenure.  The fact that his unique ability to teach a journalism class helped him secure a contract as a lecturer does not create a reasonable inference that Plaintiff was unlawfully discriminated against on the basis of either race or gender when she was denied tenure.  Likewise, the same inference is not raised by Birt's appointment as a lecturer after MSU also denied his tenure application because he had a long relationship with the university (more than a decade in the department and an MSU alum) and had demonstrated collegiality.

competition for the department's one tenure slot.  In fact, the record shows that two members of the department, Serequeberhan and Crosby, were simultaneously awarded tenure the next year.

Plaintiff's allegations against the President do not raise a reasonable inference of unlawful discrimination by him and on the record before the Court would not allow a jury to ultimately conclude that unlawful discrimination played a role in his decision to deny tenure.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  As stated earlier, Plaintiff attempts to impute liability to the President on the grounds that he falsely told her that she lacked appeal rights, failed to conduct an independent review that would have detected inconsistencies indicating unlawful discrimination, failed to administer the university's EEO program, and failed to hire her as a full professor.

First, the President's September 18, 2002, letter to Plaintiff was substantially devoted to resolving Plaintiff's continuing misconception that she had accepted the June 28, 2002, offer of deferral.  Defs.' Ex. 22.  In its final substantive paragraph, however, the letter stated the President's belief (based upon Plaintiff's letter of August 26, 2002) that Plaintiff's appeal to the VPAA was filed on

31

July 19, 2002, beyond the deadline for appeal, which if true would have ended the appeal process.  Id.  In fact, while Plaintiff did send the untimely July 19th letter to the VPAA, she had also sent the VPAA four other letters, of which the first two were timely, contesting the deferral.  Just three days after the President's letter, on September 23, 2002, the VPAA sent Plaintiff a letter addressing her stream of appeal letters and notifying her that the two timely letters and their accompanying materials would be considered at her upcoming appeal hearing.  Defs.' Ex. 32.  The VPAA also stated that she had read the President's letter from three days before.  Id.  The VPAA concluded with a request that Plaintiff contact her office to schedule an appeal hearing.  Considering these facts, it would not be a fair reading of the President's letter to conclude that Plaintiff "was fired before her appeal to [the VPAA] had even been heard."[18]  Pl.'s Opp. at 23.

---

[18] The Court notes further that Plaintiff is patently overreaching and misstating the record where she asserts "MSU's President also admitted that he falsely accused [Plaintiff] of backdating [a letter . . . .] Ex. 7 at 215-21." Pl.'s Opp. at 24.  The attack is rooted only in the President's deposition testimony regarding a discrepancy in letter dates, where he states, "I do not know whether the letter that [Plaintiff] sent to us was backdated to be the 17th.  I have no idea."  Pl.'s Ex. 7 at 216.  This assertion that the President falsely accused Plaintiff of backdating a letter goes beyond the general lack of civility and aggressive lawyering that has typified the behavior of Plaintiff's counsel in this case.

Rather, Plaintiff's contract was set to end in June 2003, unless she successfully appealed the deferral decision.[19]

Review of the President's deposition also reveals that he relies heavily on the advice and analysis of the VPAA in hiring and tenure decisions.  His alleged failure to conduct an extensive individualized review of each tenure candidates' applications merely leads to the conclusion that he cannot be considered the sole decisionmaker under <u>Hill</u>; it does not, however, raise an inference of unlawful discrimination. Likewise, the President's unfamiliarity with the detailed workings of his Equal Employment Office does not reasonably lead to the conclusion that the office is merely a sham that fails to assist members of the community who consider themselves victims of discrimination.  Finally, the decision to hire Plaintiff as an associate and not a full professor does not raise an inference of discrimination merely because the Chair had suggested that she be hired as a full professor. In short, there are no facts from which one can reasonably conclude that the President was motivated by unlawful

---

[19]   The Court finds no support in the record for Plaintiff's bald assertions that the deferral offer "would vary the terms of her original contract by forcing her to give up the right to pursue the tenure appeal she had just filed" or that Plaintiff held a "right to a fourth year in her contract."  Pl.s' Opp. at 22.

discrimination in his decision to defer Plaintiff's tenure and deny her appeal of that decision. See Larebo v. Clemson Univ., 175 F.3d 1014, 1999 WL 152863 *4 (4th Cir. Mar. 22, 1999) (unpublished decision) ("When considering whether a decision to deny tenure was based on an unlawful reason, the plaintiff's evidence of pretext 'must be of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously or manifestly unsupported.'").

Because the President relies heavily on the VPAA for almost all of his tenure decisions, it is especially important under Hill to determine if her actions and omissions raise a reasonable inference of discrimination by Defendants. The sum of Plaintiff's allegations against the VPAA are that she failed to conduct an independent review that would have detected inconsistencies indicating unlawful discrimination and delayed notifying her of her adverse tenure decision.

The VPAA's review of Plaintiff's tenure application does not raise a reasonable inference of unlawful discrimination. Plaintiff's file accurately revealed that her application for tenure did not have the support of her white Chair, any member of the DRC or SRC, or the Dean. These committees were diverse by race and gender, which further undermines any inference of unlawful discrimination. Several committee members included

34

statements addressing Plaintiff's poor relations with her
colleagues.  The Dean commented at length that he recommended
deferral because there was uncertainty over Plaintiff's
teaching and relationship with some of her students.
Notwithstanding these undisputed facts, Plaintiff sees
unlawful discrimination in the VPAA's failure to infer racism
or sexism from certain alleged inconsistencies in the
application dossier and her decision not to recommend
Plaintiff for tenure that year.

Review of the recommendations in the dossier shows that
variations in Plaintiff's ratings for "service" arise, at
least in part, from inconsistent interpretations of what
"service" entailed.  The form itself is somewhat ambiguous; it
asks the reviewer to rate the applicant's "Service to the
University or Community."  Defs.' Ex. 15.  Those who rated
Plaintiff highly focused on her community-wide activities
while those who rated her poorly focused on her poor relations
with colleagues.  Id.  This is not the type of inconsistency
that should prompt the VPAA to believe that racial or gender
discrimination was influencing the evaluations.[20]

---

[20]  By way of contrasting example, an inference of gender
discrimination would be raised if Plaintiff's male colleagues
reported that she was not collegial and gave her low service
scores but her female colleagues reported that she was and
gave her high scores.

35

Plaintiff alleges that the VPAA should have been particularly suspicious of the evaluation prepared by DRC member Rosalyn Terborg-Penn.  While the record shows that Terborg-Penn's evaluation demonstrated a limited understanding of Plaintiff's background and accomplishments and was therefore entitled to little weight, it does not raise a reasonable inference of unlawful discrimination by the actual decisionmakers.[21]  Given the unanimous recommendation against tenure at all levels, the inconsistencies cited by Plaintiff do not preserve her claim.[22]

Plaintiff's last stab at the VPAA and President

---

[21]  Terborg-Penn did not personally observe Plaintiff teach as a reviewer is supposed to do, but she also did not represent that she had observed Plaintiff teaching.  Rather she openly expressed her view that Plaintiff had prevented her from scheduling observation time and that she considered that indicative of Plaintiff's uncooperative nature.

Plaintiff also seeks to create a trial issue here out of the unrelated fact that Terborg-Penn has a contentious relationship with colleague Jo Ann Robinson, a white female. In 2001, Robinson filed a formal grievance accusing Terborg-Penn of unprofessional and unethical conduct.  The grievance, however, raised no claims whatsoever of gender or racial discrimination.  Instead, Robinson protested what she considered Terborg-Penn's tyrannical control over the History Department and its students as well as her extremely vindictive nature.  Robinson's allegations, even if true, do not raise an inference of racial or gender discrimination.

[22]  While Plaintiff alleges that the late-June notification of deferral was inconsistent with Defendants' March target date, that delay does not raise an inference of discrimination.

challenges their handling of the deferral appeal process.
Plaintiff essentially claims the review was a sham but cannot
provide any evidence to refute the fact that she had a student
rebellion in one of her classes, did not get along with her
department colleagues, irrespective of race and gender, and
did not have a single reviewer recommend her for tenure.
After the VPAA heard and denied the appeal, Plaintiff appeared
before a specially convened three-person appeal committee.
The committee noted some minor problems with the tenure review
process, such as the fact that Terborg-Penn had not observed
Plaintiff's teaching, but still supported the decision to deny
tenure.  Defs.' Ex. 26.  The President subsequently notified
Plaintiff by letter that he accepted the committee
recommendation, her appeals were at an end, and her contract
would expire at the end of June 2003.

Considering the constraints of Hill's actual
decisionmaker test, the undisputed weaknesses in Plaintiff's
candidacy, and the Fourth Circuit's consistent admonition
against interfering with a university's tenure process, the
Court concludes that the plaintiff's evidence of pretext is
clearly not "of such strength and quality as to permit a
reasonable finding that the denial of tenure was obviously or
manifestly unsupported."  Larebo v. Clemson Univ., 175 F.3d

1014, 1999 WL 152863 *4 (4th Cir. Mar. 22, 1999) (unpublished

decision).  Unless Plaintiff can make a valid mixed motive

claim, Defendants are entitled to summary judgment on the

Title VII claims.

### b.  Mixed motive

While the mixed motive test is traditionally considered

more accommodating to the plaintiff, it does not diminish the

fact that "[t]he ultimate question in every employment

discrimination case involving a claim of disparate treatment

is whether the plaintiff was the victim of intentional

discrimination.'"  <u>Hill v. Lockheed Martin Logistics Mgmt.,</u>

<u>Inc.</u>, 354 F.3d 277, 286 (4th Cir. 2004) <u>cert. dismissed</u>, 125 S.

Ct. 1115 (2005) (quoting <u>Reeves v. Sanderson Plumbing</u>

<u>Products, Inc.</u>, 530 U.S. 133, 153 (2000)).  For the reasons

just stated in Section III-C-1-a, <u>supra</u> pp. 23-35, Plaintiff

has not created a triable issue on whether Defendant MSU's

actual decisionmakers acted with unlawful discriminatory

animus when they denied her tenure application and offered her

a deferral.  For this reason, Plaintiff's claim of race and

gender discrimination fails under both tests and Defendant's

motion for summary judgment on these claims will be granted.

### D.  Sexual harassment/ hostile environment

The Supreme Court holds that sexual harassment

38

attributable

to the employer is among those discriminatory employment actions proscribed by 42 U.S.C. § 2000e-2(a).  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786-87 (1998). Specifically, Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (internal citations omitted) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).

The Fourth Circuit directs, "[t]o state a hostile work environment claim, [a plaintiff] must allege that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer."  <u>Bass v. E.I. Dupont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir. 2003).  Whether the severity or pervasiveness of the conduct makes it abusive "can be determined only by looking at all the circumstances."  <u>Harris</u>, 510 U.S. at 23.  The harassing conduct must be both objectively and subjectively abusive.

39

<u>Harris</u>, 510 U.S. at 21-22.

With discovery complete and on the record facts, still construed in the light most favorable to Plaintiff, no reasonable factfinder could conclude that Plaintiff experienced sexual harassment that would constitute a valid hostile environment claim.  Plaintiff simply has not satisfied the third element's severity or pervasiveness requirement.

Plaintiff bases her hostile environment claims on the actions and omissions surrounding two students' submissions of internet pornography to her and three subsequent occasions where she was hugged at work.  The Court addresses each in turn.

### a.  Pornography incidents

In May 2002, following class discussion in which some of Plaintiff's students expressed their favorable views of pornography, Plaintiff asked her Ethics and Values students to submit an extra-credit on-line assignment to construct a web page that included three internet links, and stated that those assignments that "investigate the topic of pornography" would be given additional credit.  Pl.'s Opp. Ex. 20 at 316.  Two black male students subsequently submitted web pages with links to explicit pornographic images, which Plaintiff opened and viewed.  <u>Id.</u>  While factually disputed, for summary

judgment purposes the Court will presume that Plaintiff had explicitly told her students not to send her pornography and that the images included depictions of young black men sexually abusing older white women.

Following this incident, Plaintiff had very limited contact with each of the two students.  In an e-mail dated July 19, 2002, almost two months after the incident, the first student e-mailed Plaintiff to see if he could make up the "incomplete" grade and to state that he had no intention of harassing her but merely was seeking extra credit when he submitted the images.[23]  Defs.' Ex. 61.  In August 2002, the second student came to Plaintiff's campus office and asked to close the door to speak privately with her about the "incomplete" grade that he had received in the course.  Pl.'s

---

[23]  The entire e-mail message follows:
My name is Devin Dockery, and I wanted to know if there was any way I can make up the "incomplete" grade I received for Spring 2002, Ethics and Values class.  As of yet I haven't heard anything from the Dean, the department chair, nor you.  I don't know where I stand with this situation, but if its [sic] possible I would like to know if I could complete the grade.  For what its [sic] worth, harrassing [sic] you really was not my intent with making the web page.  I was attempting to get the extra credit, which I really needed because I was in danger of failing the course.  I know you feel it was intentional, but it was not.  Please let me know where I stand with this harrassment [sic] issue.
Defs.' Ex. 61.

Opp. Ex. 20 at 473-75.  According to Plaintiff, after she stated that the door would remain open, he became upset, shouted that he would complain to the Dean, and called her names.  Id.  Plaintiff states in her deposition that she did not believe he was threatening to physically harm her but was merely seeking a grade change.[24]  Id.

While this Court in no way disputes the voluminous case law recognizing the gross inappropriateness of exposure to pornography in the workplace in all but the rarest circumstances (e.g., federal agents seizing child pornography pursuant to their employment obligations), such exposure does automatically create a jury issue.  Examination of these facts under Harris's totality of the circumstances approach shows that no reasonable juror could conclude that Plaintiff was in an objectively abusive work environment.  First, the pornographic transmission was from Plaintiff's students (who are neither employees of Defendant MSU nor named as defendants in this action) as part of an assignment where they were told by Plaintiff that addressing pornography would earn extra

---

[24]  Plaintiff's hostile environment claim survived Defendants' motion to dismiss, in part, because her complaint "allege[d] a physical threat against her person by one of the harassing students made after her initial communications to [Dean] Hollis were ignored."  March 15, 2004, Mem. at 19. Full discovery, however, has revealed that no such threat was made.

credit.[25]  Second, the exposure to pornography was isolated to

the two students' electronic submissions[26] on this one

assignment.  Third, beyond the July 2002 e-mail and August

_____

[25]  The court briefly notes that this would be a vastly
different case if, for example, Plaintiff's colleagues or
supervisors had gratuitously exposed her to pornography or
encouraged her students to do so.  Plaintiff's assertion,
however, that she was forced by Defendant MSU to re-expose
herself to the images because "the tone of [Dean Hollis's]
letter has compelled me to print out the images" does not
withstand reasoned analysis.  Pl.'s Ex. 64 (EEO complaint
letter).
     Dean Hollis's letter, dated Sept. 24, 2002, stressed that
any sexual harassment investigation would be conducted from
the Office of Diversity and Equal Employment Opportunity, and
then requested the offending students' work product as part of
his own investigation of the academic disciplinary component.
Defs.' Ex. 62.  He plainly stated that if re-viewing the
materials would further victimize her, she could provide him
with a web address, or if that could not be done "without
distress, then please let me know, and we will attempt to find
an alternative method for you to provide me with the student's
work product."  Id.  In her October 2002 EEO complaint,
Plaintiff further criticized the Dean for sharing the images
with the female VPAA pursuant to his investigation and added
her conclusion that "Dean Hollis, in sending these images to
the VPAA, has in fact joined in the original act of sexual
harassment against me, and has also committed an additional
offense against [the VPAA.]"  Pl.'s Ex. 64 (emphasis in
original).

[26]  The first student's web page contained links entitled
"Teen Sex," "online porn sites," and "Lesbian Kissing!" and
contained short descriptions of the sites' pornographic
content.  Defs.' Ex. 54.  The second student's web page
consisted entirely of the "Intro Message" heading above the
phrase "Hi I'm Chuck and I'm going to show you porno" and the
"Favorite Links" heading above a solitary link titled "Black
porno."  Defs.' Ex. 55.  No reasonable juror could conclude
that someone reasonably seeking to avoid exposure to offensive
pornography would have opened both students' web page links.

43

2002 office argument, Plaintiff did not have any further interaction with the offending students.

Plaintiff attempts to bolster the third element of her hostile environment claim by bootstrapping Defendants' allegedly inadequate response to the incidents, properly considered under the claim's liability analysis (prong four), to the abusiveness analysis (prong three).  While Plaintiff makes solid arguments to support the fourth prong, employer liability based on its inadequate response,[27] in order to make Defendants' response relevant to her third prong, Plaintiff must show that Defendants' actions and omissions in response to this incident were so deficient as to foster an objectively abusive environment.  <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21-22 (1993); <u>see also</u> March 15, 2004, Mem. at 17-19

---

[27]   To the extent that Plaintiff has accurately characterized Defendants' lack of action or communication in response to her sexual harassment claims, Defendant MSU's response is unimpressive.  Plaintiff promptly sent a written memorandum to her acting department head, Janice McLane, alerting her to what had happened and plainly stating her desire to pursue a claim of sexual harassment against the students.  Pl.'s Opp. Ex. 71.  Weeks later, in a letter dated June 17, 2002, Plaintiff wrote to Dean Hollis asking, <u>inter alia</u>, "how to handle <u>sexual harassment by two students</u>."  <u>Id.</u> (emphasis in original).  Plaintiff's letter noted that she had alerted Dr. McLane, who was presumably following up on the incident with Dean Hollis, and briefly recounted the factual basis of the potential claim.  <u>Id.</u>  In October 2002, however, under Plaintiff's version of events, Defendant MSU's EEO officer still was not aware that the pornography incident had occurred.

(explaining how employer's callous or indifferent response to harassment may contribute to finding of severe and pervasive harassment).  This, she simply cannot do.  The record clearly shows that Dean Harris did not compel Plaintiff to re-expose herself to the pornography, <u>supra</u> note 25, and Plaintiff was not subsequently threatened by her student, <u>supra</u> note 24.  In this context, Chairman Begus's alleged statements that Plaintiff unwittingly invited the entire incident by her poorly conceived assignment speaks merely to the sufficiency of Defendants' response to Plaintiff's sexual harassment claims (prong four) and cannot fairly be construed as an independent action severe or pervasive enough to constitute sexual harassment (prong three).

### b.  Hugging incidents

Plaintiff also seeks to bolster her claim of severe and pervasive sexual harassment with three instances, all subsequent to the pornography incident, where she was hugged by men while at work.  Yet, Plaintiff herself, in her October 30, 2002, letter to Defendant MSU's EEO Director, characterizes these hugs as "spontaneous hugs given to me with the most filial of intentions," that only initially appeared "aggressive" to her because of her previous exposure to pornography.  Defs.' Ex. 57.  Plaintiff's openly acknowledged

45

misperception of filial workplace interactions as acts of
sexually based aggression is only relevant to the alleged harm
she has suffered from the exposure to pornography; no
reasonable factfinder could conclude that these hugging
incidents were independent acts of sexual harassment.

    E.  Section 1983 claims

    As stated above, Plaintiff is unable to sustain her Title
VII claims of race and gender discrimination in Defendants'
tenure denial and sexual harassment; her § 1983 claim arises
out of the same set of facts.  Defendants are therefore
entitled to summary judgment on the § 1983 claim.  See
Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994) ("Courts
may apply the standards developed in Title VII litigation to
similar litigation under § 1983."); see also Mosely v. N. Va.
Community College, 129 F.3d 1259, 1997 WL 716431 *2 (4th Cir.
1997) (stating that because "conduct failed to state a Title
VII claim, it fails under § 1983 as well").

    F.  Motion to seal

    Defendants' consent motion to seal the record will be
denied.  "[T]he presumption in favor of public disclosure of
court records can only be overcome by a significant
countervailing interest."  Under Seal v. Under Seal, 326 F.3d
479, 486 (4th Cir. 2003) (citing Rushford v. New Yorker, 846

F.2d 249, 253 (4th Cir. 1988)).  Defendants rest their motion on general statements invoking the confidentiality that normally attaches to student records and personnel decisions, but otherwise do not point to any significant countervailing interest to justify denying the public access to these court records.  Defendants also cite no case law in support of their motion.

**IV.  CONCLUSION**

For these reasons, Defendants' motion for summary judgment will be granted and their motion to seal will be denied.  A separate order consistent with the reasoning of this Memorandum will follow.

      _____/s/_____
      William M. Nickerson
      Senior United States District Judge

Dated: August 2, 2005